# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

LATENTIER, LLC,

        Plaintiff,

    v.                                      Case No. 08-C-501

INTERNATIONAL PAPER COMPANY,

        Defendant.

---

## DECISION AND ORDER

---

Presently before me in this patent infringement action are cross-motions for summary judgment on the issue of inequitable conduct. Also pending are Plaintiff's two motions to dismiss the inequitable conduct counterclaims, a motion to amend the complaint, a motion for reconsideration, and a motion to amend the counterclaims. Both sides believe that inequitable conduct is a threshold issue and agree that if the motions cannot be resolved by entry of summary judgment, a bench trial is in order. For the reasons given below, I conclude that the motions for summary judgment should be denied because a genuine issue of material fact exists as to the inventor's intent to deceive the patent office. I address the other pending motions at the end of this opinion.

## I. Background

The invention at issue relates to a method of matching the production speed of a paper mill to the demand for paper, a process that ultimately produces paper at lower operating costs. United

States Patent No. 6,157,916 begins with the observation that "[c]urrent control systems of the machinery and processes of a facility in the papermaking industry generally run equipment and processes as fast as possible, while maintaining a set level of quality." (Dkt. # 33, Ex. 15 at col. 1, ll. 11-14.) "[T]he assumptions that faster is better (if quality is acceptable), underlies the prior art control systems. This is a faulty assumption: faster might actually be less desirable." Instead of the "as fast as possible" approach, the '916 patent describes a process whereby a papermaking machine operates at a "desired operating speed," which is "determined by calculating the cost of manufacturing, the manufacturing inflow, and the manufacturing outflow at a plurality of potential operating speeds . . . The desired operating speed is determined by calculating a marginal cost of manufacturing, a marginal manufacturing inflow, and a marginal manufacturing outflow . . ." (*Id.* at col. 4, ll. 36-44.) In other words, the patent states that a papermaking machine would operate cheaper if it were run by an integrated system or program that calculated the optimal speed of operation based on a number of economic inputs and outputs.

## II. Summary Judgment on Inequitable Conduct

Both sides have moved for summary judgment on the Defendant's inequitable conduct counterclaims. Summary judgment is appropriate if the moving party establishes that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a "duty of candor and good faith" to the PTO. *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 439 F.3d 1335, 1339 (Fed. Cir. 2006) (quoting 37 C.F.R. § 1.56(a) (2004)). Given that duty, a patent applicant must disclose to the PTO all material information he

2

possesses, even if doing so would weaken his application. "Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.,* 605 F.3d 1305, 1315 -1316 (Fed. Cir. 2010) (quoting *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988)). Although summary judgment can be granted if an inequitable conduct claim is doomed as a matter of law, such claims often involve factual disputes; as such, the Federal Circuit "urges caution" in making an inequitable conduct determination at the summary judgment stage. *Paragon Podiatry Lab. Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1190 (Fed. Cir. 1993).

## A. Materiality

As noted above, the first question in assessing an inequitable conduct claim is whether the information not disclosed was material. Information is material if there is a substantial likelihood that it would have been important to a reasonable patent examiner in considering whether to allow the patent. *Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.,* — F.3d —, 2010 WL 2160917, *4 (Fed. Cir. 2010). Information "may be material even though it would not invalidate the patent." *Id.* IP's inequitable conduct counterclaims focus on two pieces of information Hoffman did not timely disclose to the PTO, and I address the materiality of that undisclosed information below.

## 1. Hoffman's 1980 Publication

IP contends that Hoffman committed inequitable conduct by failing to disclose to the PTO an article he published in 1980. Some background is in order. Just before the '916 patent issued in 2000, Hoffman made a continuing application employing (in IP's view) claim terms almost

3

identical to those set forth in the '916 patent.  Once the '916 patent issued, Latentier then accused the Georgia-Pacific Corporation (not a party here) of infringing the '916 patent.  Georgia-Pacific responded by accusing Hoffman of inequitable conduct in failing to disclose his 1980 publication.  In response, Hoffman did disclose the publication to the PTO during the prosecution of his continuing application.  On December 15, 2006, the PTO examiner rejected the claims in the continuation application on the grounds that they were anticipated by the 1980 article Hoffman had now disclosed.  IP argues that because the continuation application contained claims that were nearly identical to the original '916 patent, it is clear that the 1980 article was material not just to the continuing application but to the '916 application as well.  Accordingly, Hoffman was under a duty to disclose the article during the '916 application process, and his failure to do so constitutes inequitable conduct.

Latentier does not challenge IP's view that the claims in the continuation patent were extremely similar to those of the '916 patent.[1]  (In fact, the continuation application was initially rejected as an attempt at "double-patenting," meaning the examiner thought it was simply an effort to extend the life span of the pre-existing '916 patent.)  Latentier instead argues that the 1980 article was simply not material to the '916 application because it had nothing to do with control systems and varying the drive speed of papermaking process.  (In short, it disagrees with the patent examiner.)

---

[1]Latentier briefly suggests that the addition of the term "continuous process" played a role in the rejection based on the article, but it does not elaborate beyond that.  Instead, it limits its discussion to the argument (addressed below) that two other examiners believed that the article was not material, thus shielding Hoffman from an inequitable conduct allegation.  (Dkt. # 40 at 19-23.)

4

The 1980 article is entitled, "Small Tonnage Increases Examined by Medium Mill for Cost-effectiveness." (Cunningham Decl., Ex. 8.) It begins as follows:

> Most papermakers subscribe to the assumption that the faster a paper machine can be run, producing quality product, the lower the cost will be. The average production person would probably have a difficult time accepting the fact that sometimes a reduced production rate can actually increase profitability.

> However, this can happen when production rates exceed a paper machine's optimum level of energy efficiency. . . .

> Particularly in times of decreased product demand when maximum output is not a primary consideration, a mill can operate very profitably by balancing production against this optimum, that is, minimizing energy consumed per ton of product produced.

(*Id.*)

The idea behind the article, as well as the '916 patent, is that faster is not always better. The marginal gains from the extra production at higher speeds are sometimes lower, due primarily to energy costs associated with equipment such as steam showers. "[T]he slower a machine can be run for a given production rate, the lower the energy costs will be." (*Id.*) In the example given in the article, use of a steam shower and more vacuum could increase the speed of a given machine by 5 percent. But the efficiency of the machine would drop because the cost of the energy needed to generate that additional steam would exceed the benefit obtained from the increased production. (*Id.* at 2.) By using these calculations and methods, the article explains, the Green Bay Packaging mill was able to remain profitable during 1975 and avoid layoffs even during a period of reduced demand.

As noted earlier, the examiner of the continuing application rejected the new claims in the continuation patent on the grounds that "the invention was patented or described in a printed

5

publication . . . more than one year prior to the date of application for patent in the United States."

25 U.S.C. § 102(b). The examiner concluded that Hoffman's 1980 article had disclosed

> the business method to include: controlling the operating speed of a <u>continuous process</u> manufacturing facility (Incremental efficiency concept deals with the efficiency associated with incremental changes in machine speed) comprising the steps of: determining a current operating speed of said <u>continuous process</u> manufacturing facility . . . ; determining a desired operating speed (optimal efficiency); the desired operating speed dependent on at least one economic variable that varies depending, on the operating speed; . . . comparing said current operating speed to said desired operating speed; adjusting said current operating speed in response to said determination . . .

(Cunningham Aff., Ex. 3 at 23.)

The phrase underlined by the examiner – "continuous process" – was the only material addition Hoffman had made to the original claims of the '916 patent. (As noted earlier, Latentier has not suggested a reason why its addition of this phrase would affect the materiality question.) Eventually Hoffman was able to obtain his continuation patent (the '965 patent, which is not asserted here) by making a few other additions, including changing the term "adjusting" to "adjusting directly by control of the machine drive." As IP notes, however, the fact remains that the examiner viewed the 1980 article as a bar to Hoffman obtaining a patent on a continuation claim that is nearly identical to those of the '916 patent at issue here. Because the examiner actually thought the article was a prior publication, it follows that the article would have been material to previous examiners during the '916 prosecution.

Latentier also argues, however, that other information in the hands of the examiners was even more material than the 1980 article. As such, the 1980 article would have been merely cumulative, non-material information that would not have affected the invention's patentability either way. Latentier first cites the Hart patent ('689), which the examiner considered. That patent

6

described a paper making process based on economic factors such as the cost of raw materials, the price of the finished product, labor costs, and final product quality. In its supplemental brief, Latentier notes that the examiner also had an article by Kaya, et al. IP has recently asserted its view that the '916 patent is anticipated by Kaya, which means IP believes Kaya is highly material. As such, because the PTO possessed and considered both the Hart patent and Kaya, both of which were material, Latentier argues that Hoffman's 1980 article would have added nothing new to the mix and need not have been disclosed.

But the mere fact that the PTO had in its possession two other references that are material does not mean that the universe of material information has been exhausted or that the patentee is relieved of his disclosure obligations. Latentier's premise is that IP, having now alleged that the Kaya article invalidates the '916 patent, cannot *also* allege that other prior use or publications could invalidate the patent. But this of course is a false premise based on a circular definition of materiality, which posits that if one piece of information is material, then any other similar information must be cumulative and therefore *im*material. Notably, Latentier does not even cite the Kaya article on which it relies or explain how Hoffman's 1980 article relates to Kaya,. Accordingly, Latentier has provided no basis on which I could conclude that Hoffman's 1980 article would have been cumulative to the Hart patent or Kaya article.

An additional problem for Latentier is that we need not speculate as to what was material or cumulative because the examiner *actually* found the 1980 article to be a prior publication of the invention described in the '965 patent, which is a continuation patent of the '916 patent at issue here. (And, as noted above, Latentier does not explain why the minor additions to the '965 patent would impact the materiality question.) Thus, we need not guess as to whether the 1980 article

7

would have been cumulative because the examiner based his rejection of the claims on that very article. Latentier cannot say that the article is "cumulative" when in fact it was the very basis the examiner cited in rejecting the continuation claims. Accordingly, I conclude that the 1980 article was material information that should have been disclosed to the PTO during the '916 application process. The remaining question is whether Hoffman possessed the requisite intent to deceive the PTO.

### 2. Prior Use at Green Bay Packaging

In addition to the 1980 article, IP also argues that the invention had been in use at Green Bay Packaging, where Hoffman worked in the 1970s and 1980s. IP contacted three present and former employees of Green Bay Packaging who had experience with the implementation of Hoffman's ideas. Ray Freyaldenhoven stated that "[i]n the 1980's, there were periods when the market demand for paper was low." During these periods, Green Bay Packaging would sometimes "slow down the speed of its paper machines to meet the low demand, rather than completely shutting down the paper machines because the costs of shut down were too high." (Freyaldenhoven Decl., ¶ 4; Cunningham Decl., Ex. 4.)[2] Another employee, Jeffrey Walch, made a similar statement in his declaration:

> While I was at the Green Bay mill in the 1980's, there were periods when the market demand for packaging was low. Consequently, the demand for paper at Green Bay Packaging's box plants was also very low. Rather than over-producing paper that the box plants could not utilize given the low market demand for packaging, Green Bay Packaging would only produce the paper that was necessary to meet the market demand for packaging. In order to lower its production rate, Green Bay Packaging

---

[2]The parties make much of the fact that IP's attorneys may have drafted the declarations that these employees signed, and the employees may not have known that their statements could be used to suggest that Hoffman had concealed material information from the patent office. For present purposes, all that matters is that none of the employees has retracted his declarations. These statements are not being used to establish intent to deceive, but merely to show that the substance of the invention may have been in use long before the patent was applied for.

8

would either temporarily shut down the paper machine or slow the speed of the paper machine to a speed that would meet the demand. In many cases, Green Bay Packaging chose to slow the paper machine rather than shut it down because the costs associated with shutting the machine down were too high.

(Walch Decl., ¶ 5; Cunningham Decl., Ex. 5.)

The third Green Bay Packaging employee, David Borowski, described how Hoffman would analyze the costs of the papermaking process at different speeds to arrive at an optimal operating speed:

During the 1980's … Green Bay Packaging . . . analyzed the variable costs of the papermaking process at different paper machine speeds to determine at what speeds the paper machines would operate at the highest profitability. In some instances, the paper machine speed was controlled by directly changing the machine drive of the paper machine. In other instances, the paper machine speed was controlled by utilizing or not utilizing capital equipment, such as a vacuum pump. As an example, we were able to increase the profitability of the papermaking process at Green Bay Packaging by directly reducing the speed of the machine drive of the paper machine to operate the paper machine at speeds less than full capacity such that higher cost wood resources were not utilized. By operating slower to the extent of the lower cost wood resources, we were able to make and sell product at higher profit margins.

(Borowski Aff., ¶ 6.)

In sum, these three employees testified that the speed of the paper machines at Green Bay Packaging were manipulated based on what would be most profitable – lowering speeds during periods of lower demand, for example. This was accomplished through "directly changing the machine drive of the paper machine," or by "utilizing or not utilizing capital equipment." (*Id.*) IP asserts that this prior use invalidates the '916 patent and should have been disclosed to the PTO because it puts into practice the '916 patent's "invention" decades earlier.

Latentier has argued that the 1980 article, discussed above, describes the totality of the processes used at Green Bay Packaging. (Supp. Walch Decl., ¶ 5.) That is, everything testified to

9

by the Green Bay Packaging employees was disclosed in the 1980 article, and so any prior use of the invention at Green Bay Packaging is essentially coextensive with the prior publication. IP has not argued otherwise. Accordingly, because the prior use was coextensive with the 1980 article, and because I have concluded that the 1980 article was material, it follows that the prior use at Green Bay Packaging was also material.

## B. Intent to Deceive

Having concluded that the 1980 article and the prior use of similar ideas at Green Bay Packaging were material to the '916 application, I must also determine whether Hoffman possessed an intent to deceive the PTO by failing to disclose such information. Latentier argues that IP has failed to cite any evidence suggesting that Hoffman had an intent to deceive the PTO when he failed to disclose the 1980 article. Failing to disclose something to the PTO – even something material – is not inequitable conduct unless the applicant intended to deceive the PTO. "[M]ateriality does not presume intent, and nondisclosure, by itself, cannot satisfy the deceptive intent element. . . . Rather, the alleged infringer must prove by clear and convincing evidence a specific intent to deceive the PTO." *Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Products Ltd.,* 559 F.3d 1317, 1340 (Fed. Cir. 2009). Latentier argues that even if the 1980 article and the prior use are material (which it disputes), IP has not come forward with evidence of a specific intent to deceive the PTO.

IP disagrees, and notes that it is not merely relying on the materiality of the information to suggest intent. Instead, IP relies on Hoffman's own actions as evidence of intent to deceive. Specifically, several of Hoffman's activities suggest that he knew the information would have been material to the PTO because he, himself, associated his 1980 article and the prior use at Green Bay

10

Packaging with the '916 invention. For instance, in 1998 Hoffman was attempting to be hired as a consultant for Defendant IP. In a May 1998 presentation to IP, he explained that his "Profit +23 Optimization Process" ("POP") was used at Green Bay Packaging to obtain the highest profitability ever. (DPFOF ¶ 33.) This process involved *reducing* throughput (*i.e.* running below peak capacity) to obtain higher profitability – the very idea encompassed by the '916 patent. In June 1998 (the following month), Hoffman filed his application for the '916 patent. The very next day, he gave a copy of his 1980 article to an IP employee in an effort to sell his ideas to them. (DPFOF ¶ 34.) In addition, Hoffman and his associates made similar presentations to other paper companies in which they described the "Profit Optimization Process" and cited Hoffman's extensive work at Green Bay Packaging as an example of how the POP could maximize profits.

It is obvious, IP argues, that Hoffman considered the POP to be identical to the ideas disclosed in his '916 application. At the very same time he was applying for the '916 patent, he was describing to others his work at Green Bay Packaging and sharing his 1980 article as evidence that his ideas worked. Yet he never disclosed these things to the PTO. IP thus argues that the information was not only material, but Hoffman *knew* it was material and he appreciated its materiality at exactly the moment he was under an obligation to disclose it to the patent office. That is enough to demonstrate an intent to deceive.

Not surprisingly, Latentier disagrees with IP's characterization of Hoffman's activities. It asserts that there is no factual support for the notion that he was trying to convince IP to hire him as a consultant. Moreover, he merely provided his 1980 article to IP as a "calling card" to establish his credentials in the industry. (Dkt. # 48 at ¶¶ 33-34.) Latentier further argues that the "Profit

11

Optimization Process" had a similar name but involved a different process than that described in the '916 application.

At best, Latentier has raised factual disputes about the nature of Hoffman's activities. It does not explain, for instance, why he would submit a nearly twenty-year-old article to IP as a "calling card" if he was not trying to sell IP on the process described therein (or a similar process). Nor has Latentier explained why he would need to "establish his credentials" with IP if he was not trying to sell IP something, and neither has it explained why he would cite both his article *and* his prior experience at Green Bay Packaging if those pieces of information had nothing to do with the relationship he was trying to establish with IP. In short, having concluded above that the undisclosed information was material to the '916 application, I further conclude that IP has demonstrated that Hoffman may have known the information was material at the very time he was applying for the patent. That is enough to create a genuine issue of material fact.[3]

But that does not exhaust the matter. Latentier's principal argument on the question of intent is that the PTO's own actions demonstrate that Hoffman's failure to disclose the article was a good faith omission. *Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Products Ltd.,* 559 F.3d 1317, 1341 (Fed. Cir. 2009) ("evidence of good faith . . . militates against a finding of deceptive intent.") Specifically, Latentier argues that the 1980 article had been in the PTO's hands for nearly five years and had not been found material by two different examiners. It was only after a third examiner was assigned to the application that the article was found material. Thus, even if I conclude that the article is material, it argues, IP cannot show that Hoffman had an intent to deceive the PTO when

_____

[3]Because the question of intent is so fact-intensive, however, I cannot grant IP judgment as a matter of law.

12

the PTO's own examiners apparently entertained differing views on the article's materiality. In fact, Latentier argues that two examiners "agreed" with Hoffman and his attorney that the 1980 article was not material. As such, it asks, "how can Roger Hoffman's belief that the 1980 Article was not material lack good faith when a series of USPTO examiners agreed with him for almost 5 years?" (Dkt. # 40 at 19.)

But IP points out that the PTO never explicitly "agreed" with him that the article was not material; it was simply silent on the article. There is nothing in the record suggesting that the previous examiners had ruled either way on the article; instead, the record merely reflects the fact that the article was in the PTO file on the application. At most, the record reflects that examiner Cosimano had initialed the article, indicating that he had seen it. That he did not flag it immediately and reject the claims on that basis does not mean that he agreed that the article was not a prior publication or that the question was debatable, but merely that the question had not arisen until the third examiner took over the application.

But even if the record means that the prior examiners "agreed" with Hoffman that the 1980 article did not constitute a prior publication, that is not the question presently before me. Instead, the inequitable conduct question is whether the publication was *material* to that issue, *i.e.*, whether a reasonable examiner would have considered the article important. Of course, patent examiners are not asked to determine whether information disclosed to them is "important" but merely whether the information is invalidating or not. The question of the article's materiality is broader because information may be material "even though it would not invalidate the patent." *Leviton Mfg. Co., supra,* 2010 WL 2160917, *4. Thus, the question is not whether the prior examiners would have agreed with the final examiner in concluding that the 1980 article was a prior publication; the

13

question is whether they would have found the article "important" to that determination. Given the fact that the most recent examiner actually found the article to be an invalidating prior publication, it is difficult to believe that the previous examiners would not have at least "considered [the article] . . . important." *Id.* Accordingly, I cannot conclude that Hoffman acted in good faith merely because two examiners did not explicitly conclude that the 1980 publication was a prior publication.

It goes without saying that intent is always going to be a difficult proposition. It will be the rare case in which a patentee communicates his intent to deceive orally or in writing. After all, when an inventor endeavors to deceive the PTO, his goal is secrecy, and so it is natural that he will not go around telling his colleagues and friends that he is withholding a material document from the PTO. So we are usually left to make inferences. Materiality in itself is not enough, the cases say, but if the information is highly material and the patentee knows it, and if the patentee discusses the information with others in promoting his ideas but then fails to disclose it to the PTO, a factfinder might reasonably conclude that the patentee's nondisclosure was a deliberate effort to hide information from the PTO. The alleged prior use at Green Bay Packaging and the 1980 article were not dusty memories of the ancient past: Hoffman touted his experience and shared the article at the exact same time he was applying for the '916 patent, and as such the information he did not disclose was fresh in his mind. These factors preclude entry of judgment on behalf of Latentier.

Importantly, the *Larson* case, on which Latentier relies, involved a court's finding of intent to deceive *after* a bench trial. At the summary judgment stage, it would be difficult to require a party claiming inequitable conduct to produce any more than what IP has produced here. After all, the question boils down to Hoffman's own mental state, and the most one could expect from IP

14

under these circumstances would be a showing of materiality combined with motive and the inventor's knowledge that the information existed.

### C. Claim Construction

Above I have concluded that the undisclosed information was material and that there is at least a genuine issue of fact as to whether Hoffman possessed the requisite intent. These conclusions were founded largely on the fact that the PTO examiner, during the continuation application, rejected the very similar continuation claims on the basis of the 1980 article. Part of Latentier's defense, however, is based on a claim construction argument that is largely unrelated to the issues discussed above.

The central claim construction dispute puts the parties in positions that are initially counterintuitive. IP, the accused infringer, asserts that the patent is very broad, whereas Latentier, the patentee, argues for its narrowness. Essentially, Latentier argues that IP has created a straw man by pressing an "impossibly broad reading" of the '916 patent. Specifically, Latentier argues that IP's reading of the patent fails to account for the special meaning of the term "adjusting." (Dkt. # 40 at 12.) Claim 1 of the patent reads as follows:

> 1. A method of controlling the operating speed of a papermaking facility comprising the steps of:
> Determining a desired operating speed, the desired operating speed dependent on at least one economic variable that varies depending on the operating speed; and
> **adjusting** the operating speed in response to the determination.

('916 Patent, col. 17, ll. 20-26.)

In IP's view, "adjusting" incorporates any kind of manipulation of the operating speed to achieve the desired speed. For instance, it could involve the manual manipulation of the speed by an employee or by the machine not using (for example) a vacuum pump – *i.e.*, the kinds of methods

15

that were used at Green Bay Packaging for years, according to the employees IP talked to. (Borowski Aff., ¶ 6.) Any kind of speed "adjustment" is fair game. As such, the use of the slowing-down methods at Green Bay Packaging, as described in the 1980 article, constitutes a prior use that Hoffman should have disclosed to the PTO.

By contrast, Latentier argues that "adjusting" has a more narrow meaning, namely: "adjusting directly by control of the machine drive." Latentier notes that this was the construction it proposed in the claim chart it exchanged with IP during this litigation, and IP did not object to it. More substantively, Latentier argues that the entire purpose of the patent is to create an automated system or program that controls the speed of the machines through the machine drive rather than through the kind of manual and *ad hoc* alterations employed at Green Bay Packaging. In the first paragraph of the summary of the invention, for example, the specification explains: "According to a first aspect of the invention a method of controlling, and apparatus, which can include a computer program, that controls, the operating speed of a papermaking facility includes determining a desired operating speed . . . [which] is adjusted (if necessary) in response to the determination." ('916 patent, col. 4, ll. 18-26.) This makes it clear that "adjusting" is not simply tweaking by hand or using some other method; the adjusting must be accomplished by an apparatus or computer program that controls the operating speed. This theme is echoed throughout the patent. For example: "The present invention is, in one embodiment, a method and apparatus for an integrated control system in a manufacturing facility . . . that implements an optimal operating speed . . ." (*Id.*, col. 5-6, ll. 66-2.) Finally, Latentier notes, the patent examiner, in allowing the patent, observed that prior art (Keys) discloses that "the process of making paper is controlled on economic factors." But, he found, "the prior art does not teach or suggest in regard to claims 1, 21 & 33, a system which senses

16

a variable of a paper making process . . . determining the desire[d] operating speed based on the sensed variable and adjusting the actual operating speed of the paper making process in response to the sensed variable." (Dkt. # 40 at 14.)  Thus, Latentier argues, the examiner agreed with its view that "adjusting" meant "adjusting directly by control of the machine drive."

IP argues that the patent explicitly notes that the operating speed is *not* limited to being directly controlled by the machine drive: "While operating speed of a paper machine may be adjusted directly by control of the paper machine drive, it is often adjusted by changes to the steam pressure for the paper machine dryers." ('916 patent, col. 2, ll. 4-8.)  But this statement is found within the "background" section of the specification.  It is not an effort to explain the '916 invention but is instead a reference to the history and then-current methods of adjusting operating speed.  As such, it does not support IP's construction of the claim term.

IP further bases its broad construction on the deposition it conducted of Roger Hoffman. When asked if Latentier contends that IP infringed the patent "when it slows output to meet customer demand," Hoffman responded as follows: "Well, again, I don't know that we have defined your definition of demand, but, I think in the classic definition of demand absolutely because demand is the most fundamental economic variable." (DPFOF ¶ 71.)  Thus, Hoffman himself has ostensibly claimed that a company would infringe his patent if all it did was to slow output to meet customer demand.  Although IP concedes that such a broad patent would be "remarkable," that is what Hoffman himself claims.  (Dkt. # 32 at 1.)  And because he used the process taught in the patent long before he applied for the patent (in 1998), this prior use invalidates the patent and renders his failure to disclose the prior use inequitable conduct.

17

A few snippets from deposition testimony do not bear on the question of what "adjusting" means, however. Hoffman's current beliefs and statements in depositions do not shed light on what he should or should not have disclosed to the PTO a decade earlier, and his own view of the patent's scope is simply not material.[4] Otherwise, the public at-large would not be able to rely on the plain terms of patents but would instead be forced to depose inventors to learn their secret and subjective views of the scope of their inventions. Accordingly, I do not find Hoffman's deposition testimony probative of the meaning of the term "adjusting." (Even so, however, it is noteworthy that the inventor does not appear able to articulate a more narrow embodiment of his invention that would correspond to the narrowing construction his company's lawyers now propose.)

Most problematic for Latentier, however, is the glaring fact that the examiner actually rejected the continuation claims on the basis of the 1980 article, as discussed at length above. If the patent examiner actually believed that "adjusting" in the '916 patent had the specific narrow meaning Latentier now attributes to it, then why would the examiner have found the 1980 article – which describes a much broader notion of "adjusting" – to be a prior publication of the same invention? That article says nothing (as Latentier itself argues) about "adjusting directly by control of the machine drive" – it is instead a broad description of a general method of increasing efficiency. If the patent examiner believed that the 1980 article was a prior publication of an invention very similar to the '916 patent, then it is likely an examiner would believe the '916 used the broader, common definition of "adjusting" rather than the more narrow one Latentier now proposes. In fact, the continuation patent was only allowed *after* Hoffman added the "adjusting directly by control of

_____

[4]Presumably Hoffman's statements could be suggestive of intent to deceive, but I do not rely on them in construing the actual claim terms.

18

the machine drive" language to its claims. (Dkt. # 32 at 10.) If it was clear from the specification that "adjusting" already had that meaning, why was it necessary to add that language in the continuation patent? This strongly suggests that "adjusting," as used in the '916 patent, does not carry the narrowing limitations Latentier now proposes.[5]

Thus, for present purposes I reject Latentier's argument that the non-disclosed information was immaterial because the information did not relate to an invention that adjusted speed "directly by control of the machine drive." Even so, I am mindful of the fact that we have not undertaken explicit claim construction proceedings in this case. Although the parties have placed the inequitable conduct counterclaim on the front burner, Latentier has based part of its inequitable conduct defense on claim construction, which means it would appear that the term "adjusting" must be construed definitively before I could rule on materiality. Thus, it seems necessary to incorporate some kind of claim construction proceeding into the bench trial on inequitable conduct. My preliminary claim construction, as discussed above, is that "adjusting" simply means "adjusting." I will allow Latentier to argue otherwise in the context of a bench trial on inequitable conduct, but because the issue is a discrete one that has already been briefed, I do not expect it to consume a large amount of additional resources.

**D. Summary**

In sum, I conclude that IP has established the materiality of the information Hoffman failed to timely disclose to the PTO. I further conclude that a genuine issue of material fact exists as to

---

[5]In addition, I am mindful of the impropriety of importing limitations from the specification into the claims, and of relying on embodiments to redefine or limit claim terms. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.")

19

Hoffman's intent to deceive the PTO. Accordingly, both motions for summary judgment will be denied. The motion for a bench trial on inequitable conduct will be granted, and, as set forth above, Latentier will be afforded the opportunity to argue the claim construction of the term "adjusted" within that context.

### III. Latentier's Motions to Dismiss and for Judgment on the Pleadings

A number of motions and cross-motions have been filed in this action, but Latentier began the filings with a hybrid motion for judgment on the pleadings and summary judgment. Its motion also sought to dismiss the inequitable conduct counterclaim under Fed. R. Civ. P. 9(b). More recently, it renewed this motion by virtue of another motion to dismiss the amended counterclaims. (Dkt. # 89.) As described above, Latentier's motion for summary judgment will be denied because I conclude there are genuine factual disputes on the question of intent. That factual question also precludes entry of judgment on the pleadings.

In support of its motions to dismiss, Latentier relies on Rule 9(b), which requires particularity in the pleading of fraud (which includes inequitable conduct). Latentier asserts that IP's answer and counterclaim has failed to set forth the who, what, where, why and how of Hoffman's alleged intent to deceive. In response to Latentier's motion, IP has filed its own motion seeking leave to amend its pleadings to conform to the evidence and facts discussed above. This motion will be denied as moot, however, because I conclude that IP's original and first amended counterclaims meet the requirements of Rule 9. As suggested above, it is unclear what more a defendant-counterclaimant could plead apart from materiality, opportunity and motive. There is no mystery that the claim involves Hoffman's failure to disclose his 1980 publication and the

20

invention's prior use at Green Bay Packaging. This is set forth in paragraph 23 of the amended counterclaim:

> The '916 Patent is unenforceable due to inequitable conduct because the inventor, his patent counsel, and/or other individuals associated with the filing and prosecution of the application for the '916 Patent, violated their duty of candor and good faith in dealing with the PTO by intentionally and deceptively failing to disclose to the PTO material information, including the 1980 Pulp & Paper article, the 1995 Paper/Forest Products Global Outlook Conference speech and paper, and Hoffman's use of the patented process at Green Bay Packaging, during the prosecution of the application for the '916 Patent.

(Dkt. # 56, Ex. 1.)

Latentier has not explained what more it needs to learn from the pleadings, and the briefing already undertaken in this case underscores the fact that the parties are well apprised of the specifics of the allegations. IP has shown the undisclosed information to be material, and it has cited evidence from which the factfinder could conclude that Hoffman knew it was material. From there it would not be a large leap to conclude that the failure to disclose was intentional. Rule 9(b) does not require any more than that, and requiring a new round of pleadings on particularity grounds would be an unduly technical result given what's already been argued and presented to the Court. Accordingly, Latentier's motion for judgment on the pleadings and its motions seeking dismissal will be denied.

**IV. Additional Motions**

Latentier also seeks reconsideration of this Court's decision and order granting IP's motion to amend its counterclaim to include Roger Hoffman as a defendant. It asserts that Hoffman, now that he is named personally, will need to hire his own counsel and expend considerable sums

21

defending the inequitable conduct charge. This should be avoided, however, because IP's motion to amend was brought long after it knew there was a basis to add Hoffman as a defendant. Its motion was not based merely on the issue of Latentier's possible uncollectability, as the motion had originally asserted, but also on the fact that Hoffman could be named personally regardless of Latentier's collectability. This later argument was raised only in IP's reply brief.

First, it is unclear why Hoffman would need to incur significant legal expenses. By now it is clear that the counterclaim is solely about his own conduct and mental state. Thus, Latentier's and Hoffman's defense to the counterclaim will likely be identical and should not require duplicative legal expenses. Second, even if the motion to amend was not brought as soon as IP knew it had a basis for bringing it, Latentier has not explained what IP would have to gain from being dilatory or what possible strategic advantage it secured by bringing the motion more recently. If anything, by Latentier's own logic, IP saved Hoffman a year's worth of legal expenses by naming him only now. Finally, the fact that IP cited an additional basis for granting the motion in its reply brief does not change anything. IP notes that motions for reconsideration are strongly disfavored, and that is particularly true in a case that has already involved a great deal of resources and generated some ten motions without even having reached the questions of validity or infringement. There is, in short, no basis for reconsideration.

Latentier has also filed a motion to amend its complaint to add a claim for trade secret misappropriation. This Court previously denied such a motion because Latentier had not set forth any reason explaining its two-year delay in asserting the claim. In its renewed motion, Latentier now argues that much of the information underlying its proposed amendment was not produced in discovery until early this year. This sufficiently explains why it did not bring the claim sooner, and

22

IP has not contested that assertion. (The parties instead focus on their communications immediately following the disclosure of the information.) In addition, I am satisfied that the claim can be litigated without substantial additional discovery or delay. After all, Latentier could simply file a new action asserting the trade secret claim, and that would no doubt involve the same expenditures of time and resources that would be involved here. Accordingly, I conclude that Latentier has adequately explained the delay and shown that there would be little prejudice. Accordingly, the motion to amend will be granted.

## V. Conclusion

The motion for summary judgment, dismissal, and/or judgment on the pleadings (Dkt. # 26) is denied. The motion for summary judgment (Dkt. #31) is denied. The motion for a bench trial (Dkt. # 31) is granted. The motion for leave to file a first amended complaint (Dkt. # 75) is granted. The motion for reconsideration (Dkt. # 84) is denied. The motion to dismiss (Dkt. # 89) is denied. The motion for leave to file a second amended counterclaim (Dkt. # 93) is denied as moot.

**SO ORDERED** this ____1st____ day of July, 2010.

  s/ William C. Griesbach
William C. Griesbach
United States District Judge

23